I please the Court. Good morning. Robert Wood for Appellants, the Alderson family. I actually have with me today Mr. Alderson, Sr., Jim Alderson, and Justin Alderson. If I could, I'd like to reserve three minutes of my time, please. This is a tax refund case in which the sole question is whether Alderson's gain as of ordinary or capital character comes before this Court following the summary judgment that was granted in favor of the government by the District Court. We come here today asking this Court to reverse the judgment of the District Court and order entry of judgment in favor of the Alderson's or, in the alternative, to reverse and remand the case. There are two questions in this posture before this Court. First, viewing the evidence in the light most favorable to the Alderson's, whether there are any genuine issues of material fact. Second, whether the Court properly applied the substantive law when it granted summary judgment in favor of the government. The District Court failed on both counts. In this fundamental character question, the judge's key ruling in the District Court was that Alderson conveyed no property to the government, and this is erroneous for several reasons. I suppose in large part it is based on an incomplete factual record. This is evident from the Court's exclusive focus on the intangible nature of the information, and yet it's very clear that Alderson provided both intangible and tangible property, delivering a much more than merely intangible property. There were cost reports from hospitals, basically voluminous information and documents. He turned over as he was required to do under the False Claims Act. Again, the Court ---- That's property in the general sense of the term, but I think the trial judge was also in the context of defining property for purposes of this case. This isn't trade secret type of property. This isn't something that the defendants developed. This is something that they did not have exclusive access to. So he was discussing it in the context of trade secret and distinguishing it. I think that's right, Your Honor. He was certainly focused, the district judge was very focused on trade secret law. Something that, frankly, surprised us, surprised me, when we became aware that he was very interested in trade secret law and seemed to think that if this information and documentation was not of a trade secret nature, it might not be property at all, or that it needed to be trade secret to qualify for capital gain treatment. We offered to bring into court voluminous evidence showing the nature of the materials, the confidential legends, including such items as, do not show this to government auditors, things of that sort. And the judge nevertheless ruled that it wasn't trade secret and wasn't property. I would just say that we believe that much of this information did qualify as trade secrets and that Alderson had ownership rights in some of this information, even though certainly it was property of HCA and Quorum, much of it was. However, there are tax cases, which we cited in our briefs, in which property qualifies for capital gain treatment information and documents, notwithstanding the fact that it may technically not be a trade secret. And I would point your honors to U.S. Mineral, to Frazell, United States Mineral Products, and Ofria, all three tax cases that we have cited. The second major failing in the district court was, on a matter of law, not applying the facts of this case to the standard this court enunciated in McGinnis. That is, of course, another tax case in which the court drew the distinction between capital and ordinary, a fundamental distinction in the tax law. How are rewards treated? Let's say there's a reward, $100,000 for information leading to the arrest of Joe Jones. I supply the information. I get the $100,000. Is that capital gain or ordinary income? It's a good question, your honor, and I think that bothered the district court. What's the answer? Pardon me. The answer is ordinary income. And I would say that I think there is some concern in this case, or I sense there was some concern in the briefing and in the discussion we have seen thus far, in kind of a floodgates concern that any informant, I think the district judge referred to a mafia informant, that that is in some sense a transfer of information in some fashion in exchange for money and isn't my argument that that would be capital gain. And what happened here, I think, to state it in lay terms, is a transfer of information and then a lot of work by Mr. Alderson. Indeed. All of it entirely praiseworthy. But, of course, performing work and getting paid for work is not capital gains. Indeed. Of course, you're right, your honor. However, another, if you'll permit me to use the term canard in this case, is precisely what your question is addressing, and that is, is this case really about services? Well, the case is about acting in a key TAM case, and he's providing information, he's performing work, and he ends up getting a fair amount of money, which I think he entirely deserved. So we both were providing information, we're providing intangible information, we're providing documents containing information, and we're performing work. Yes, your honor. But if I could, on the services point, just to enunciate my view on the services issue, because I do know that this was a concern to the trial judge. The False Claims Act statute is quite clear in terms of the way in which the relator awards are paid, and the first 15 percent is really for the information, and the case law confirms this. It's for the information the government would not otherwise acquire, even if the relator thereafter performs no services but merely filing the complaint and turning over the information and documents, he or she gets the 15 percent. I guess that's point one. And he ends up getting 16, right? Indeed, yes. In this case, 16, as you've stated. Second, there was never a contention here by the government, and talking to Mr. Alderson, who's knowledgeable about False Claims Act history, neither of us is aware that the government has ever argued, in this case or any other, that a relator share in a False Claims Act case is subject to self-employment tax or is for services. And indeed, when the government reports a payment, in this case it did, and in others I've seen, on a 1099, as it did for Mr. Alderson, it reports it in Box 3 of that form as other income, kind of a neutral characterization, not in Box 7, which is the services category. Would my reward for $100,000 be subject to sort of self-employment income and so on either? It certainly could be. It certainly could be. And I will also say this about the services point, that as you, Your Honor, have said, Alderson worked tirelessly on this case, and there's a reported decision about the case from Florida that extols his virtues as a patriot and so on. But we all know, I think, in kind of common experience, that when you have an asset and you work on it and you fix it up. I once bought, to my chagrin, a very old falling-down house. And the fact that I spent lots of weekends and nights working on it didn't make me performing services for gain and for personal service income, but rather went to the appreciation and the asset. And finally, on the services point, one of the other plaintiffs in the Alderson family is the Alderson, Jim and Connie's son and daughter, Justin and Jennifer. They acquired their interests in this case through the family limited partnership, which we'll get to in a moment. I'm sure you may have read about it, which was established in this case sort of at a midpoint during the process of the case. And there could be no contention that Justin or Jennifer Alderson rendered services to get their share. It was an investment asset in the partnership. So as to the McGinnis test, let me say in the time I have remaining the two prongs of McGinnis and why this is so important. McGinnis, as this Court said, in trying to distinguish between capital and ordinary, you look to two things. One, is there an underlying investment in McGinnis? Under the facts of McGinnis, a lottery ticket, that certainly wasn't an underlying investment. We looked to Alderson, a point that we thought we had established as a matter of law that his investment was substantial, in excess of $15,000 of his own money, not deducted for tax purposes, but properly capitalized as you would do with capital expenditures. He invested this at a time when his family income was about $50,000 for a family of four. $15,000 plus was a lot of money. So we believe we have met squarely the first McGinnis test. Second, was there an accretion in value, an increase in the value of this over time? Again, squarely we think we meet McGinnis' test. That is, over this 10-year period from 1993, when Alderson as a relator, again, a unique statute filed, accepting the contract, which this Court's Kelly decision says a unilateral contract with the government, Alderson accepts it, files the claim in 1993. In 1998, the government intervenes in the case. Alderson then, in 1999, commissions an appraisal for gift tax purposes, filing gift tax returns. I would point this Court's attention to what we sometimes in the tax world, and Your Honors, in this Court, characterized as a, or called a duty of consistency in tax matters. Gift, income tax, you want to be consistent in whether you're a taxpayer or the government. Alderson did that. He prepared, commissioned, and filed gift tax returns based on this appraisal. Midpoint valuation, $3 million in 1999, $27 million by 2003. So, once again, we don't understand why the Court, the District Court, would not apply the McGinnis test, which we squarely believe we have met. Does the U.S. Supreme Court case of Gillette, which your opponent argues, help you or hurt you? We think it helps us, Your Honor. We think it helps us. Gillette, and there's a great, and I see I'm going over my rebuttal time, but Gillette and many of the other cases that are discussed on this fundamental capital, you know, is something a capital gain or is it not? I think the government has done an admirable job of trying to narrow the field and show that virtually nothing is capital. But, in fact, that's not so. I mean, as Gillette and many other authorities we cite indicate, there are capital assets everywhere. Our living room couch that most of us have or television set in our home, those are capital assets. We don't think of them that way because we would rarely sell them. And if we did, we'd probably experience a loss, not a gain. Personal loss is generally non-deductible. But there are capital assets everywhere. Water rights, this Court held capital assets. Government subsidies. I mean, I have kind of a list of unique or at least seemingly odd capital assets, authorities that say these things are capital gain for tax purposes. But we think that this is entirely consistent and not inconsistent with them. Let me reserve my time and thank you. Thank you. You have a minute and a half. We'll give you two minutes. Thank you very much. Thank you, Your Honors. May it please the Court. My name is Damon Tafe representing the United States. I think that we really have three points here, that taxpayers here need to show that there was property, that the property was a capital asset, and that if there was property and it was a capital asset, then it was sold or exchanged in a capital transaction. And we contest all three points in the brief. And it's been a little tough from time to time to narrow down exactly what they mean by property, because at times they've spoken of Mr. Alderson's, his knowledge of what he had in his head, and at other times it's been what documents he had. And those things are very different under the law. I think it's both, I think. Maybe it's both, but we have to, those things are treated differently under the law of property. And we didn't get a lot of analysis from them about each one in particular, but I'd first like to fall back on a broader point, which is that we need to be very careful in this context when we're discussing property and discussing capital assets, because in a colloquial sense, anything you own and can assign could be called property, ideas, couches, most anything else. And once you have property and it's capable of being transferred, you could characterize it as a capital asset that you're selling or exchanging. But the Supreme Court, I think Gillette does help us, Your Honor, because the Supreme Court, it's not just the government saying that we're trying to narrow the field. It's the Supreme Court saying that we have to, that this doctrine should be construed narrowly in accordance with the purpose of Congress to afford capital gains treatment only in situations typically involving the realization of appreciation in value. Any sort of case that discusses broad notions like property and capital assets is going to be a battle of characterizations, but there must be some sort of predictability and uniformity in the law. And so the Supreme Court has said that this needs to be construed narrowly. And the first thing I would point to in this is the Second Circuit's case in, or decision, I'm sorry, in the Glenn Miller case dealing with property rights. It's a seminal decision. And the Second Circuit in that case said that the publicity rights to a dead celebrity are not property rights. They're not capital assets. And the main reason they decided that was because the taxpayer was able to introduce no clear-cut decisions, quote, unquote, that they had ever been considered as such. Now, you might say, well, that's not, you know, an academically satisfactory conclusion, but it's important because predictability and tradition are extremely important and paramount, and you're deciding what is property as conventionally understood. So having said that, I'd first like to move to the question of property. In this Court's Rasmussen case, there are three factors. The first is interest capable of precise definition. I think they've given us a couple. The second is whether it's capable of exclusive possession or control. And here's where I think they begin to fall down, because as we explained in our brief, the knowledge of wrongdoing is not something that's capable of exclusive possession and control, and that is where all of the value comes from for the United States here. It's bringing knowledge of wrongdoing to the view of the government so that the government can recover the money, you know, with the assistance of the writer, and he's been well compensated in this case, rightly so. But the thing that is valuable for him is not quite literally documents saying keep these double books confidential, but it is evidence of this wrongdoing against the government, evidence of fraud. And evidence of fraud is not something that property rights recognize as capable of exclusive control. So that's one reason I think they don't get to property. And it actually kind of blends into the third, which is that the putative owner must establish a legitimate claim to exclusivity. And we don't think he's established a claim to exclusive knowledge of this knowledge of wrongdoing. Certainly he knows about it, but other people know about it, too. Somebody else in the company could have filed a PTAM claim, I suppose, and beaten him to it. Other people knew about this. The wrongdoers certainly know about it. I'm sorry? The wrongdoers certainly know about it. They certainly do, yeah. It's just not a conventional property or trade secret as we think about it. So if the knowledge is not exclusive and is not property, what about the documents? Well, I think the documents, they may be considered property, but they wouldn't be considered capital assets. They wouldn't be considered capital assets. And I don't want to skip over the idea of a trade secret. I'll come back to it if you're interested in it. But it's not a capital asset under the McGinnis test, which asks two things. First of all, is there an underlying investment? And in response to Your Honor's question, he said, well, counsel for opposition pointed to the McGinnis lottery ticket question. And a lottery ticket is something you can hold. It's something you can sell. But in McGinnis, this Court said that's not a capital asset because there's no investment as conventionally understood in it. It's a gamble. And he said, well, they spent tens of thousands of dollars here building it up. Well, you could have bought tens of thousands of lottery tickets, but that wouldn't have changed the underlying nature of the lottery ticket, which is a gamble. And in this case, there was no investment in knowledge of wrongdoing for its own sake, with the expectation that that would pay off. His lawsuit and the way that he got all this information was for wrongful determination, I believe. And certainly he found these documents as part of that, but he didn't invest in these documents and development of it in order to pursue this reward. And I think that's what this Court was thinking of in McGinnis. The second aspect of McGinnis is the question of whether there's been appreciation over time. And in this, we don't think that there is, in the sense that courts mean appreciation over time. In 1993, they could have gotten a valuation, but that valuation simply would have reflected uncertainty, because from the moment they filed this suit, they fell into the bucket under the FCA, if you will, that is information that's not publicly disclosed, and then I guess the 15 to 25 percent range. And they were in that bucket from the minute they filed their suit. The only thing that was not known at that point was the extent of the fraud. But the property that they brought to the table there, the documents, that is, that didn't change over time. It is what it is. It documents the extent of the fraud, and then the question is, to what extent can you prove it? Could they have sold that asset in 93? Just to another citizen or something? I'm asking you. I suppose they could have. There's no reason why you couldn't sell documents, I suppose, if you have them. It certainly wouldn't be protected as a trade secret. But there's no appreciation here, because the valuation simply reflected uncertainty. It's uncertain in 1997 what the ultimate recovery would be, and in 2003 it turned out to be higher than what the valuation predicted that it might. But the basic problem here is that it seems very odd to us to have the question whether something is a capital asset turn on the vagaries of a valuation from somebody who is not a congressman, who doesn't work for the government. This is not a law that was passed defining the contours of capital assets. And once you start getting into whether valuation and the amount of that valuation drives the existence of a capital asset, it becomes very weird, because what if, and this didn't happen, but what if at a certain point Mr. Alderson had sold half of his interest in his key TAM recovery to someone unrelated to him? I understand there were assignments within the family, but he just sells it. And he sells it for $5 million. Turns out, when we finally get down to the end of this, he makes $25 million, and so half is no longer worth $5 million, it's worth $12.5 million. So the person who paid $5 million now has a $7.5 million gain. Does that person report ordinary income or capital gain? It's a good question. I think it probably, in that case, would have to be ordinary income also in this case. Because? Because of the nature of the underlying claim. And courts have said that you can't kind of transmogrify the nature of ordinary income into a capital asset by the expedient of selling it. If it would have been ordinary income to the person selling it, it would be income as well to, I think, the person reporting capital. We may not have this exact example in key TAM cases, but we probably have, and you may be familiar with the practice, very expensive lawsuits whose outcome is uncertain, there often now is some assignment. So somebody can invest in the proceeds of the lawsuit, I'll front you a million dollars in return for half of the attorney's fees. So let's say I front you half a million dollars. Let's say I front, to make my numbers easy, I pay the lawyer a million bucks, or I pay the client a million bucks so that he can proceed in return for half of the recovery. His recovery is four million bucks. I, therefore, get two million. So I've invested a million, I get back two million capital gain in ordinary income. Just to make sure I understand the question, you front somebody litigation expenses in exchange for a portion of the recovery. Right. And I pay a million dollars in return for half of the recovery. The recovery turns out to be four million dollars, so I get two. I just made a million bucks. Is that capital gain or ordinary income? I have a feeling there's a right answer to this question. I think there probably is. I just don't know what it is. Because that happens. I mean, we know this happens. Yeah, I honestly don't know what the answer is, and so I would just be speaking off the cuff. I mean, I think one of the distinctions here, and these are distinctions and fact patterns, but the question is, against whom does your remedy lie? So, for example, and this is actually the last point I was going to make, so it segues nicely into it, whether there's a sale or exchange of the asset here. Part of the problem is that if an asset is appreciating in this case, you have to ask what the asset is. And according to taxpayers, and I think they're right, if there's a capital asset that's appreciating, it has to be the claim to a portion of the recovery that the government ultimately gets. But if that asset is the right to a claim on the recovery, then actually getting the recovery extinguishes the claim. It's a payment on a legal claim. And we cite in our brief, the Nahee case, the Fairbanks decision by the Supreme Court, the payment of a legal claim is not a capital sale or transaction. It extinguishes the claim. It does not transfer it to someone else. So I think that the taxpayers here have a bit of a dilemma, which is that they have to point to where the sale or exchange happened here. If it happened in 1993, then everything wrapped up in 1993, and there can be no appreciation because that's when the sale occurred. But if what they got in 1993, that is the documents they had. If they sold the documents, then what they had to get was in 1993, and what they got in exchange for that was a claim. But if they got a claim in 1993, and that's the thing that appreciated, then that claim was extinguished in 2003 with the ultimate payment, but that's the satisfaction of a legal claim. It's not a capital sale or exchange. So that's why I think they have to choose one or the other here. If there's a sale, it has to be at one time or the other. And either there's no appreciation or there's no sale, as legally understood. And the last thing I would touch on is just stepping back broadly, I think the taxpayers have done a creative job here of working with language in order to offer definitions of terms that could fit within the legal requirements that you get property and you get capital assets. But stepping back, the Supreme Court in Vermont characterized Cuitam Awards as a bounty. Last fall in the Campbell case, this came out after a briefing, 658 F. 3rd, 1255, the Eleventh Circuit said the related award is in the nature of a reward. The Rocco Tax Court case said this is equivalent to a reward for efforts to obtain repayment. So every court, or at least most courts who have looked at this, have said that this is in the nature of a reward. And the reward is for helping the government to obtain repayment of money that was You're referring to the Supreme Court Cuitam case when you say Vermont? Yes. Yeah, yeah. But that was not a tax case. It wasn't a tax case. That was part of a freestanding case. Right, right. I mean, I hesitate to import language from that case dealing with the question of Article III jurisdiction into a capital gains court. Okay. That's fair, Your Honor. But even if that case was not speaking specifically about this, the Campbell case and the Rocco case quite explicitly were. They were considering capital asset presence in Cuitam cases. So the point is that stepping back, the FCA says that a copy of the complaint and written disclosures of substantially all material evidence should be served, shall be served on the government, and if that happens, if the government proceeds with an action, such person shall receive. This is simply saying that if you comply with the statute, you shall be entitled to a reward. That's the common sense understanding of what this is saying here. And you can characterize these things as a unilateral contract or something else, I suppose, if you want to get creative. But in common sense terms, and common sense is what the Court in Gillette said and what the Court in Miller said in the Second Circuit, common sense understandings of property and capital assets are fundamentally what we rely on here precisely because of the capability of creatively characterizing things and essentially importing vast amounts of ordinary income into capital gain treatment. The FCA simply says if you do this, if you help the government, as taxpayer did by single-handedly driving this litigation for five years, that is a service, if you do that, then you'll be entitled to a certain amount of money. They got paid a lot of money for a service nobly rendered. I think that's entirely appropriate. But as far as capital gain treatment, I don't think that it falls under the fair understandings of the law as it's historically been understood. Thank you, counsel. Two minutes for rebuttals. Thank you, Your Honors. I have a number of points I want to make. I'll try to make them quickly. The cases, Rocco, Campbell, Brooks, these cases that deal with is there related share income, I mean, we certainly are aware of them. The fact that they may use terms like bounty or reward is really irrelevant to this case. I would just say on the question of is it related to share income, we've never argued that it isn't, but this question of capital asset status is entirely different. Gillette, to go back to that and to go back to this question of how narrowly or broadly, the question of property, is it related to our share property, which is our primary contention, it's hard to think of it as a contention. Bankruptcy courts have said it is and treated it as such. Divorce courts, we've cited all these in the brief. For tax purposes, gift and estate tax evaluations, legal claims, including this type of claim, are routinely valued. And, of course, as I mentioned, there was evaluation of this specific claim, which the government has, although I noticed my co-counsel mentioned it, the government has never dealt with the question of the bona fides of the appraisal and its independent use and so on. There's just been denials repeatedly. The secondary market in legal claims, and as Your Honor pointed out, this is becoming in key TAM claims and others more and more common. I know we cited a New York Times article from I think 2010 in the briefing about the nature of these hedge funds buying into these things. To respond to Your Honor's question, is that ordinary income or capital gain, I think it depends, and certainly it would depend on the business of the investor. Is the investor in that business, which would mean that any gain would be ordinary in character, or is it a true investment asset, sort of dealer versus investor status issues, if you will. The Glenn Miller case, just to respond quickly to that, certainly aware of it. I actually wonder whether it would be decided this way today, but assuming it is good law, as I assume it to be, OFREA, U.S. Mineral Products, these cases all say that providing information of the type that Alderson did can be and have been held to be capital gain. Miller, she was never, the widow of Glenn Miller, was never able to show precisely what she transferred. I would like to say in closing that Section 1234A, this contract statute, which the district court ignored, we believe gives us an independent contract basis. There's been no contention, I think, to the contrary, that Alderson acquired contract rights. The Kelly case, this Court's Kelly case in 1993, expressly says that a key tamber later is an accepting unilateral contract, and the disposition of that contract, even under my opponent's analysis, a payment of those contract rights extinguishes it. There are many cases in which there is no, with all due respect to my opponent, in which there is no sale or exchange when a legal claim is resolved, but the courts have nevertheless repeatedly held that capital gain treatment is appropriate. In essence, it is treated as a disposition. Thank you. Thank you very much. Appreciate it. The case just argued will be submitted. The final case of the morning.
judges: Zouhary, Reinhardt, Fletcher